# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| 3D SYSTEMS CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:17-cv-3252 |
| | ) | |
| PAUL A. MILLER and UNION TECH, INC. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT
### (PRELIMINARY INJUNCTION REQUESTED)

The Plaintiff, 3D Systems Corporation ("3D Systems"), by and through the undersigned counsel, hereby brings the following Verified Complaint for injunctive and other relief against Defendants Paul A. Miller ("Miller") and Union Tech, Inc. ("Union Tech") (collectively, "Defendants"), alleging as follows:

## PARTIES AND JURISDICTION

1. 3D Systems is a corporation organized and existing under and by virtue of the laws of the State of Delaware, with its principal place of business located at 333 Three D Systems Circle, Rock Hill, South Carolina 29730.

2. Miller is a citizen of the State of Indiana and resides in the Southern District of Indiana.

3. Union Tech is a corporation organized and existing under and by virtue of the laws of the State of Illinois, with its principal place of business located at 100 Illinois Street, Suite 200, Saint Charles, Illinois 60174.

4.     This Court has personal jurisdiction over Miller because Miller is a resident of this State and District and because this action arises from Miller's knowing and intentional breach of certain contractual, common law, and statutory obligations owed to 3D Systems while acting within and causing injury within this State and District.

5.     This Court has personal jurisdiction over Union Tech because Miller was an employee and agent of Union Tech expressly authorized to act on its behalf within this State and District and acting in fact on its behalf within this State and District at all times relevant to this Complaint.

6.     Pursuant to 28 U.S.C. §§ 1331 and 1367, this Court has federal question jurisdiction over this action because it arises in part under both the federal Defend Trade Secrets Act, 28 U.S.C. § 1836 *et seq.*, and the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and because all supplemental state law claims arise out of the same case or controversy as the federal claims over which this Court has original jurisdiction.

7.     Pursuant to 28 U.S.C. § 1332, the Court also has original subject matter jurisdiction over this action based on the complete diversity of citizenship among the parties to this action and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.     Pursuant to 28 U.S.C. § 1391, venue is proper in this District because Miller resides in this District and because a substantial part of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

9.     3D Systems is a leading provider of 3D content-to-print solutions, including 3D printers, print materials, and on-demand custom parts services for professionals and consumers.

10.    On December 13, 1996, 3D Systems hired Miller as a sales representative.  Over the course of his many years of employment with 3D Systems, Miller was promoted within the Company multiple times, ultimately rising to the position of Director of Sales.

11.    As 3D Systems' Director of Sales, Miller was generally responsible for promoting and developing sales of the Company's 3D printing products and managing current and prospective customer relationships within his seven-state sales territory, encompassing Indiana, Illinois, Missouri, Iowa, Tennessee, Kentucky, and West Virginia.  Miller traveled frequently throughout that territory and otherwise worked from his home in or around Indianapolis, Indiana.

12.    The 3D printing industry is extremely competitive; and, 3D Systems has expended substantial time, money, and effort developing its products, services, professional reputation, goodwill, and sales networks throughout the United States and internationally.  In doing so, 3D Systems has developed certain highly-valuable confidential, proprietary, and trade secret business information including, without limitation, current and prospective customer lists and related databases, pricing data, purchasing histories, consumer data, market intelligence and strategies, vendor and supplier data, product formulations and development information, proprietary manufacturing processes, and overall industry and product expertise.

13.    3D Systems' confidential, proprietary, and trade secret business information is neither publicly known nor reasonably ascertainable by competitors or other third parties; and, 3D Systems has taken reasonable measures to maintain the confidentiality and secrecy of all such information.  More specifically, among other measures, 3D Systems requires that all employees with access to confidential information and/or customer relationships sign contractual agreements defining their obligations to maintain the confidentiality and secrecy of 3D Systems' business information and related competitive interests.

14.     As a result of his sales roles and related access to 3D Systems' confidential information and customers, Miller was required to execute various restrictive covenant agreements throughout his employment, as amended from time to time.

15.     On July 10, 2013, Miller executed an Employee Confidentiality and Non-Solicitation and Arbitration Agreement (the "Agreement") as a condition of his continued employment at 3D Systems and as condition of his continued access to its customers and its confidential, proprietary, and trade secret information.   A true and accurate copy of Miller's executed Agreement is attached hereto as **Exhibit A**.

16.     By signing the Agreement, Miller agreed, among other things, that he would not use, divulge, disclose, or communicate 3D Systems' "Confidential Information" to any third party person, or corporation, neither during his employment nor at any time thereafter, except as necessary to the performance of his job duties for 3D Systems.   Specifically, Miller agreed:

> Employee recognizes and agrees that Employee will not, at any time, whether during or subsequent to the term of Employee's employment by the Company or any of its subsidiaries, unless done so in the performance of Employee's job responsibilities as an employee of the Company or specifically consented to in writing by the President of the Company, directly or indirectly use, divulge, disclose, or communicate to any person, firm, or corporation confidential information belonging to the Company or any of its subsidiaries or their business, as that term is defined in this Agreement.

*See* Exhibit A, ¶ 2.

17.     Miller further agreed that "Confidential Information" for purposes of the Agreement included, among other things, 3D Systems' customer, supplier, and vendor lists, its marketing strategies, research, and data, as well as other information constituting or evidencing 3D Systems' "trade secrets."   Specifically, Miller agreed:

'Confidential Information' specifically includes: (a) the identities, buying habits or practices of the Company's customers; (b) the Company's advertising and marketing strategies, methods, research, and related data; the names of the Company's vendors, resellers, or suppliers; (d) the cost, type and quantity of materials and/or supplies ordered by the Company; (e) the prices at which the Company obtains or has obtained or sells or has sold its products and services; (f) the Company's manufacturing, distribution, and sales costs, methods, and objectives; (g) technical information including machinery and equipment designs, drawings and specifications; (h) inventions; (i) pending patent applications; (j) product information including designs, drawings, specifications, methods of quality control and formulas or equations used in connection therewith; (k) 'trade secrets' as such term is defined in S.C. Code Ann. § 39-8-10 *et seq.* or other similar applicable law of any other jurisdiction; and/or (l) customer lists, pricing lists, supplier lists, or reseller lists.

*See* Exhibit A, ¶ 2.

18.     By signing the Agreement, Miller also agreed that he would not, both during his employment with 3D Systems and for one (1) year thereafter, solicit any customers of 3D Systems, neither on his own behalf nor on behalf of any third person or entity.  Specifically, Miller agreed:

Employee agrees that, during the term of Employee's employment with the Company and its subsidiaries and for a period of twelve (12) months following separation of Employee's employment with Company, including termination by the Company for cause or without case, Employee will not, directly or indirectly, either for Employee's own use or for the benefit of any other person, firm or corporation, divert or take away the business of, or attempt to divert or take away the business of, call on or solicit the business of, or attempt to call on or solicit the business of, or do business with, any of the Company's or its subsidiaries' customers, including, but not limited to, such customers as to whom Employee had called on, solicited, serviced, or became acquainted with while in the employ of the Company or its subsidiaries.

*See* Exhibit A, ¶ 4.

19.     By signing the Agreement, Miller also agreed to return to 3D Systems any and all company property in his possession immediately upon 3D Systems' request.  *See* Exhibit A, ¶ 7.

20.     By signing the Agreement, Miller also acknowledged and agreed that all records related to 3D Systems' customers and related accounts were the exclusive property of 3D Systems and that he would immediately deliver all such records to 3D Systems when his employment ended.  *See* Exhibit A, ¶¶ 8-9.

21.     Miller further agreed that his violation of the terms of the Agreement including, without limitation, his breach or threatened breach of the Agreement's confidentiality and non-solicitation covenants, would entitle 3D Systems to immediate injunctive relief to restrain further breach of the Agreement, in addition to all other rights and remedies available to 3D Systems under applicable law.  Specifically, Miller agreed, in pertinent part:

> Employee agrees that a breach or threatened breach by Employee of this Agreement, including its covenants, could not reasonably or adequately be compensated in damages in an action at law, and that Company shall be entitled to injunctive relief, which may include, but shall not be limited to, restraining Employee from performing any action that would breach this Agreement.

*See* Exhibit A, ¶ 10.1.

22.     On August 14, 2017, Miller unexpectedly provided 3D Systems with notice of the resignation of his employment, to be effective August 25, 2017.  Miller confirmed that he was resigning to accept a position with another company, but refused to identify his new employer or otherwise participate in an exit interview.

23.     On August 15, 2017, Miller's supervisor, Vice President of Sales Greg Elfering, directed 3D Systems' IT Department to terminate Miller's electronic access to 3D Systems' electronic communications and data systems including, without limitation, the 3D Systems' e-mail system, customer relationship management system, and document management system.  In

addition, because Miller was many customers' primary point of contact with 3D Systems, Elfering requested that any e-mails sent to Miller's 3D Systems account be redirected to Elfering's own e-mail account until a long-term transition plan or new salesperson could be put in place.

24.     On August 25, 2017, the effective date of Miller's resignation, 3D Systems sent Miller a letter memo reminding him of his obligations under the Agreement and enclosing a courtesy copy for his review.  The memo also directed Miller to return immediately his 3D Systems laptop and any other company property in his possession, and enclosed a prepaid shipping label for him to use for that purpose.  A true and accurate copy of 3D Systems' memo to Miller is attached hereto as **Exhibit B**.

25.     On August 30, 2017, Elfering received an e-mail from an unfamiliar e-mail address with the subject line "Case No: 422425" and the greeting "Hi Paul."  Assuming the e-mail was from a 3D Systems customer or vendor not yet aware of Miller's resignation, Elfering opened the e-mail and confirmed that it was sent to Miller's former 3D Systems e-mail address, [Paul.Miller@3dsystems.com], which caused the e-mail to be redirected to Elfering.

26.     The e-mail was from a representative of a data recovery company, "WeRecoverData.Com," and indicated that the company had "a case still pending arrival with you" and the representative "wanted to see if you will be bringing your media in so we can perform our diagnostic evaluation and provide you with a quote."  Because the e-mail was sent just three (3) business days after the effective date of Miller's resignation and referenced a "still pending" data recovery case apparently initiated by Miller while he was still using his 3D Systems e-mail address, the e-mail suggested to 3D Systems that Miller had attempted, or may

be attempting, to "recover," save, and store data from his 3D Systems-issued electronic devices for his use after his resignation.

27.     Elfering immediately forwarded the "WeRecoverData.Com" e-mail to 3D Systems' Human Resources personnel so that 3D Systems could both confirm that Miller's access to all electronic systems had been shut down and confirm that his 3D Systems devices had been returned.  3D Systems confirmed that Miller's access to the company's electronic databases had been terminated as of the date of his resignation.  However, 3D Systems also confirmed that Miller had failed or refused to return his 3D Systems laptop, cell phone, and all other 3D Systems property in his possession.

28.     Shortly thereafter, on September 6, 2017, Elfering received another e-mail from an unfamiliar e-mail address, with the subject line "File?" and the greeting "Good Morning Paul."  Again assuming the e-mail was from a 3D Systems customer or vendor not yet aware of Miller's resignation, Elfering opened the e-mail and confirmed that its sender had copied Miller's former 3D Systems e-mail address, [Paul.Miller@3dsystems.com], as a recipient, which caused the e-mail to be redirected to Elfering.

29.     However, unlike the "WeRecoverData.Com" e-mail, Elfering noticed that the e-mail had been directed not only to Miller's former 3D Systems e-mail account, but had in fact been sent to a different account for Miller, [paul.miller@uniontech3d.com], and that the sender had also copied Miller's personal e-mail address in addition to his former 3D Systems e-mail address.  The e-mail asked that Miller "send that file asap so we can get started for you."

30.     Elfering was unfamiliar with the sender of the e-mail, Troy Hanna at "AddressTwo," but he immediately recognized the "uniontech3d" domain associated with Miller's primary e-mail account as relating to Union Tech, a 3D printing company that competes

directly with 3D Systems. Union Tech's China-based parent company has been in the international 3D printing industry for many years, but the company was unable to market and sell its products within the United States until approximately July 2016 due to various patent issues. Upon information and belief, Union Tech had recently established a United States headquarters in Saint Charles, Illinois in an effort to break into the United States 3D printing market. Elfering interpreted the e-mail as confirmation that Miller had begun working at Union Tech following his resignation from 3D Systems.

31. Just twenty (20) minutes later, Elfering was copied on Miller's response to Troy Hanna's e-mail, sent from Miller's [paul.miller@uniontech3d.com] e-mail account with an e-mail signature identifying Miller as Union Tech's "Director of Sales, North America." Miller had apparently "replied all" to Hanna's e-mail, leaving [Paul.Miller@3dsystems.com] as a copied recipient of the e-mail and thus redirecting the e-mail to Elfering. The e-mail stated that Miller "sent [Hanna] a file yesterday" and directed him to "try this link," referring to an embedded hyperlink to a Google Drive cloud storage file.

32. After clicking the hyperlink, Elfering saw that the file was a Microsoft Excel spreadsheet titled: "All leads March 2012_March_2017" (the "Spreadsheet"). Elfering immediately recognized that the data in the Spreadsheet belonged to 3D Systems and originated from the Company's customer relationship management ("CRM") system, because it listed by name both the specific 3D Systems product(s) and/or printer model(s) of interest to each prospective customer and the name of the specific 3D Systems salesperson who generated and qualified that particular lead.

33. Upon closer review, Elfering was shocked to see that the Spreadsheet contained the entirety of 3D Systems' marketing data and customer contact information for more than

440,000 qualified sales leads generated by 3D Systems salespeople, both throughout the United States and internationally, for the five-year period from 2012 through 2017. Specifically, among other data, the Spreadsheet listed the identity of all 3D Systems' prospective customers identified throughout the world from 2012 through 2017; their representatives' names, phone numbers, street addresses, and e-mail addresses; the source of each customer lead (*i.e.*, trade show, internet inquiry, *etc.*); and a "rating" of the likelihood of purchase for each lead.

34.    3D Systems spent immeasurable millions of dollars obtaining the sales leads and marketing data reflected in the Spreadsheet, in the form of personnel costs, trade show participation, product demos, targeted advertising, web-based marketing campaigns, international travel, and other expensive but critically-important customer investment activities over the five-year period covered by the Spreadsheet. That Spreadsheet data is extremely valuable to 3D Systems, not only because it serves as a comprehensive repository for information regarding 3D Systems' competitive marketing and sales efforts, but also because Union Tech and others competing against 3D Systems for the same sales do not have the benefit of access to 3D Systems' exhaustively maintained database.

35.    Upon information and belief, Miller logged into 3D Systems' CRM system at some point prior to his resignation, generated a report of "all leads" identified by 3D Systems' salespeople and related marketing information from throughout the world for the indicated five-year period, downloaded that Spreadsheet onto an unknown device or account, and intentionally retained the Spreadsheet following the resignation of his employment at 3D Systems in order to misappropriate the information set forth therein on behalf of Union Tech.

36.    The Spreadsheet, and all information and data set forth therein, constitutes "Confidential Information" within the meaning of the Agreement, as well as "trade secrets"

within the meaning of the federal Defend Trade Secrets Act and Indiana Uniform Trade Secret Act.

37.     Upon information and belief, Miller did not have the authority or electronic access permissions necessary to access or download the scope of information reflected in the Spreadsheet.  More specifically, upon information and belief, Miller manipulated his electronic credentials and/or access permissions in order to exceed his authorized access to 3D Systems' CRM system, obtain sales lead information outside his assigned territory, and download that information into the Spreadsheet.  Miller did not have any legitimate reason related to his job duties for 3D Systems to access or download that information.

38.     Upon information and belief, Miller contracted with "WeRecoverData.Com" for the purpose of recovering, saving, and storing all confidential, proprietary, and trade secret information on his 3D Systems-owned electronic devices, including the laptop and cell phone that he failed to return promptly following the effective date of his resignation.  As a result, 3D Systems has no current means of determining the scope of the extremely sensitive and valuable business information—in addition to the Spreadsheet—that Miller misappropriated from 3D Systems as an employee and agent of Union Tech for the purpose of unfairly competing against 3D Systems.

39.     After this discovery, and given the scope and value of this data, 3D Systems sought to determine why Miller sent the Spreadsheet to Troy Hanna at "AddressTwo."  An internet search revealed that AddressTwo is an Indianapolis-based company providing a CRM platform and e-mail marketing services for business clients.  Upon information and belief, Miller either intended for AddressTwo to use the Spreadsheet to create a new CRM system for Union Tech using all of 3D Systems' data, intended for AddressTwo to send an e-mail "blast" to all 3D

Systems' qualified sales leads to solicit business on behalf of Union Tech, or both. Moreover, Miller's e-mail exchange with Hanna suggested that Miller wanted AddressTwo to perform these tasks for Union Tech as soon as possible.

40.     3D Systems has since learned that, upon information and belief, and separate and independent from his theft of the Spreadsheet, Miller uploaded approximately 30,000 sales leads and business contacts onto various AddressTwo databases between July 1, 2017 and his resignation on August 25, 2017, all of which constitute confidential, proprietary, and trade secret information of 3D Systems. Upon information and belief, Miller took these steps, while still employed by 3D Systems, for the purpose of surreptitiously storing 3D Systems' trade secret information for his use as an employee and agent of Union Tech acting on its behalf.

41.     3D Systems has also learned that, upon information and belief, Miller also violated the Agreement's non-solicitation of customers provision at least twice in the approximately two weeks that have passed since his resignation.

42.     Specifically, 3D Systems was informed by one of its service engineers that, while performing an on-site service call for a 3D Systems automotive customer in Illinois—a customer that Miller formerly managed on the company's behalf—he saw Miller's Union Tech business card on-site with the same customer, prompting the customer to comment on Miller's departure from 3D Systems and mention that Miller had just visited on behalf of Union Tech. Upon information and belief, Miller personally visited and solicited that customer—and at least one other Illinois-based customer he formerly worked with at 3D Systems—in an effort to divert their business away from 3D Systems and transfer it to Union Tech.

43.     On September 7, 2017, 3D Systems contacted Troy Hanna at "AddressTwo" by e-mail, informed him that the Spreadsheet contained 3D Systems' Confidential Information, and

demanded that AddressTwo not perform any work for Union Tech using the Spreadsheet until 3D Systems had the opportunity to enforce its related legal rights. 3D Systems also contacted Miller directly, instructing him to cease all misappropriation of 3D Systems' confidential, proprietary, and trade secret information pending the Company's efforts to enforce its related legal rights.

44. On September 8, 2017, 3D Systems, through counsel, attempted personal service of cease-and-desist letters on Miller and the registered agents of Union Tech and AddressTwo, again demanding that no further use or disclosure be made of the Spreadsheet or any other confidential, proprietary, and trade secret information owned by 3D Systems.

45. In multiple follow-up phone calls, AddressTwo representatives confirmed their understanding and compliance with 3D Systems' instructions.

46. Defendants have failed and refused to respond adequately to 3D Systems' demands or otherwise acknowledge Miller's theft of the Company's trade secrets. On September 11, 2017, four (4) days after he was initially contacted by 3D Systems, Miller finally replied that he had placed his Company computer and laptop in the mail, but did not otherwise explain his misconduct or respond to 3D Systems' allegations in any manner. Union Tech has attempted no response whatsoever to 3D Systems' communications.

**FOR A FIRST CAUSE OF ACTION**
**(Violation of the Federal Defend Trade Secrets Act)**
**(Against Defendants)**

47. Each and every allegation contained in the preceding paragraphs 1-46 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

48. The Spreadsheet and all Confidential Information contained therein including, without limitation, the identity of 3D Systems' customers and prospective customers leads,

13

customer contact information, market intelligence, and other information related to 3D Systems worldwide sales and marketing over a five-year period, constitute "trade secrets" within the meaning of the federal Defend Trade Secrets Act, 28 U.S.C. § 1836 *et seq.*

49.     The Spreadsheet is a compilation of confidential and proprietary information which derives independent economic value by not being generally known, or reasonably ascertainable through proper means, by competitors or others who can gain value from its disclosure or use including, without limitation, Defendants.

50.     3D Systems has taken reasonable measures under the circumstances to maintain the secrecy of the Spreadsheet and its component Confidential Information.

51.     Miller misappropriated 3D Systems' Spreadsheet by acquiring it through improper means and by disclosing and using the Spreadsheet with knowledge that he had acquired the same under circumstances giving rise to a duty to maintain its secrecy or limit its use.

52.     Union Tech misappropriated 3D Systems' Spreadsheet by acquiring, using, and/or disclosing the Spreadsheet with knowledge or reason to know that Miller acquired it by improper means and/or with knowledge that Miller had acquired the same under circumstances giving rise to a duty to maintain its secrecy or limit its use.

53.     As a direct and proximate result of Defendants' willful and malicious misappropriation of 3D Systems' trade secrets, 3D Systems has suffered and will continue to suffer actual damages, and Defendants have been unjustly enriched.

54.     As a direct and proximate result of Defendants' willful and malicious misappropriation of 3D Systems' trade secrets, 3D Systems is entitled to an award of actual damages including, but not limited to, the value of the unjust enrichment caused by Defendants'

misappropriation and benefit therefrom, in an amount to be determined at trial that exceeds $75,000, exclusive of interest and costs. Alternatively, 3D Systems is entitled to payment by Defendants of a reasonable royalty for their wrongful retention, disclosure, and use of 3D Systems' trade secrets.

55. As a direct and proximate result of Defendants' willful and malicious misappropriation of 3D Systems' trade secrets, 3D Systems also seeks an award of exemplary damages, attorneys' fees, and costs.

56. 3D Systems is entitled to injunctive relief to prevent Defendants' further actual or threatened misappropriation of 3D Systems' trade secrets.

### FOR A SECOND CAUSE OF ACTION
**(Violation of the Federal Computer Fraud and Abuse Act)**
**(Against Miller)**

57. Each and every allegation contained in the preceding paragraphs 1-56 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

58. 3D Systems' CRM system, internal network, and related company-owned electronic devices, accounts, and databases are "protected computers" within the meaning of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

59. Upon information and belief, Miller knowingly and intentionally accessed 3D Systems' CRM system and internal network, without authorization and/or in excess of his authorized access, with an intent to defraud 3D Systems and with an intent to misappropriate its confidential, proprietary, and trade secret information with an economic value in excess of $75,000, for use in competition against 3D Systems on behalf of Union Tech following the resignation of his employment.

15

60.     As a result of Miller's unauthorized access to 3D Systems' CRM system and related misappropriation of its confidential, proprietary, and trade secret information, 3D Systems has suffered and will continue to suffer losses in excess of $5,000 during the applicable one-year period including, without limitation, the cost of investigating Miller's misconduct, conducting a damage assessment, incurring forensic examination fees, incurring attorneys' fees and costs, and addressing the diminished value of 3D Systems' confidential, proprietary, and trade secret information resulting from Miller's illegal access and use of the same on behalf of a direct competitor.

61.     3D Systems' losses suffered as a direct and proximate result of Miller's violation of the Computer Fraud and Abuse Act entitle 3D Systems to compensatory damages, restitution, and injunctive relief

**FOR A THIRD CAUSE OF ACTION**
**(Breach of Contract)**
**(Against Miller)**

62.     Each and every allegation contained in the preceding paragraphs 1-61 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

63.     The Agreement constitutes a valid and binding contract between 3D Systems and Miller.

64.     Upon information and belief, Miller intentionally, willfully, and materially breached the Agreement in the following particulars:

(a)     Miller breached Paragraph 2 of the Agreement by communicating the Spreadsheet, which constitutes 3D Systems' Confidential Information as defined therein, to AddressTwo, and by using and/or disclosing the Spreadsheet to and on behalf of Union Tech;

(b)     Miller breached Paragraph 4 of the Agreement by calling-on, soliciting, and attempting to divert business from one or more of 3D Systems' customers less than two weeks after his termination, on behalf of both himself and Union Tech;

(c)     Miller breached Paragraphs 7 and 9 of the Agreement by retaining and failing to return immediately all of 3D Systems' property within his possession upon 3D Systems' request at the time of his resignation, including, without limitation, his 3D Systems-owned laptop; and

(d)     Miller breached Paragraphs 8 and 9 of the Agreement by retaining and failing to return immediately all of 3D Systems' customer records within his possession upon 3D Systems' request at the time of his resignation including, without limitation, the Spreadsheet.

65.     As a direct and proximate result of Miller's material breaches of the Agreement, 3D Systems has suffered and will continue to suffer actual damages.

66.     As a direct and proximate result of Miller's material breaches of the Agreement, 3D Systems is entitled to recover its actual damages from Miller in an amount to be determined at trial that exceeds $75,000, exclusive of interest and costs.

67.     As a direct and proximate result of Miller's material breaches of the Agreement, and as expressly provided in Paragraph 10 of the Agreement, 3D Systems is entitled to immediate injunctive relief to prevent Miller's further breach or threatened breach of the same.

## FOR A FOURTH CAUSE OF ACTION
### (Violation of the Indiana Uniform Trade Secrets Act)
### (Against Defendants)

68. Each and every allegation contained in the preceding paragraphs 1-67 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

69. The Spreadsheet and all Confidential Information contained therein including, without limitation, the identity of 3D Systems' customers and prospective customers leads, customer contact information, market intelligence, and other information related to 3D Systems worldwide sales and marketing over a five-year period, constitute "trade secrets" within the meaning of the Indiana Uniform Trade Secrets Act, Ind. Code Ann. § 24-2-3-1, *et seq.*

70. The Spreadsheet is a compilation of confidential and proprietary information which derives independent economic value by not being generally known, or reasonably ascertainable through proper means, by competitors or others who can gain value from its disclosure or use including, without limitation, Defendants.

71. 3D Systems has taken reasonable measures under the circumstances to maintain the secrecy of the Spreadsheet and its component Confidential Information.

72. Miller misappropriated 3D Systems' Spreadsheet by acquiring it through improper means and by disclosing and using the Spreadsheet with knowledge that he had acquired the same under circumstances giving rise to a duty to maintain its secrecy or limit its use.

73. Union Tech misappropriated 3D Systems' Spreadsheet by acquiring, using, and/or disclosing the Spreadsheet with knowledge or reason to know that Miller acquired it by improper means and/or with knowledge that Miller had acquired the same under circumstances giving rise to a duty to maintain its secrecy or limit its use.

18

74. As a direct and proximate result of Defendants' willful and malicious misappropriation of 3D Systems' trade secrets, 3D Systems has suffered and will continue to suffer actual damages, and Defendants have been unjustly enriched.

75. As a direct and proximate result of Defendants' willful and malicious misappropriation of 3D Systems' trade secrets, 3D Systems is entitled to an award of actual damages including, but not limited to, the value of the unjust enrichment caused by Defendants' misappropriation and benefit therefrom, in an amount to be determined at trial that exceeds $75,000, exclusive of interest and costs. Alternatively, 3D Systems is entitled to payment by Defendants of a reasonable royalty for their wrongful retention, disclosure, and use of 3D Systems' trade secrets.

76. As a direct and proximate result of Defendants' willful and malicious misappropriation of 3D Systems' trade secrets, 3D Systems also seeks an award of exemplary damages, attorneys' fees, and costs.

77. 3D Systems is entitled to injunctive relief to prevent Defendants' further actual or threatened misappropriation of 3D Systems' trade secrets.

**FOR A FIFTH CAUSE OF ACTION**
**(Breach of the Duty of Loyalty and Fiduciary Duty)**
**(Against Defendants)**

78. Each and every allegation contained in the preceding paragraphs 1-77 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

79. While Miller was employed by 3D Systems, Miller owed 3D Systems a duty of loyalty to refrain from acting in any manner inconsistent with its legitimate business interests.

80. Upon information and belief, Miller breached his common law duty of loyalty and fiduciary duty arising from his employment relationship with 3D Systems by intentionally

accessing, downloading, and saving 3D Systems' confidential, proprietary, and/or trade secret information as set forth herein, in violation of both his contractual and statutory obligations to 3D Systems, for the express and wrongful purpose of using all such information to compete against 3D Systems on behalf of Union Tech following the resignation of his employment.

81. Union Tech is vicariously liable for Miller's breach of his common law duty of loyalty and fiduciary duty to 3D Systems under the doctrine of *respondeat superior* because, upon information and belief, Miller's overt acts in breach of such duties were taken with express or apparent authority as an employee and agent of Union Tech and within the scope of such employment with Union Tech.

82. Alternatively, Union Tech is jointly liable for Miller's breach of his common law duty of loyalty and fiduciary duty to 3D Systems because, upon information and belief, Defendants combined in a civil conspiracy to accomplish the unlawful purpose underlying Miller's breach. Specifically, upon information and belief, Defendants conspired and agreed that Miller would wrongfully misappropriate 3D Systems' confidential, proprietary, and trade secret information during his employment with 3D Systems in order to enable Defendants' subsequent wrongful use of all such information to compete unfairly against 3D Systems during Miller's subsequent, higher-paying employment with Union Tech.

83. As a direct and proximate result of Defendants' conduct as set forth herein, 3D Systems has suffered actual damages and is entitled to recover such damages from Defendants, in addition to any amounts paid to Miller as wages for the period in which he engaged in disloyal acts.

84. 3D Systems is also entitled to recover punitive damages from Defendants as a result of Defendants' knowing, willful, and intentional misconduct.

## FOR A SIXTH CAUSE OF ACTION
### (Tortious Interference with Contractual Relations)
### (Against Defendants)

85.     Each and every allegation contained in the preceding paragraphs 1-84 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

86.     3D Systems had existing and/or prospective contractual relationships with the customers identified in the Spreadsheet.

87.     Miller had actual or constructive knowledge of 3D Systems' existing and/or prospective contractual relationships with the customers identified in the Spreadsheet.

88.     Miller intentionally, wrongfully, and maliciously interfered with 3D Systems' existing or prospective contractual relationships with the customers identified in the Spreadsheet by:  (a) accessing, downloading, and saving the data set forth in the Spreadsheet and wrongfully retaining it following the resignation of his employment, in an effort to usurp 3D Systems' sales opportunities with the customers identified therein on behalf of direct competitor Union Tech; (b) disclosing the Spreadsheet to a third-party in order to facilitate direct electronic marketing communications with the customers identified therein on behalf of direct competitor Union Tech; and (c) contacting, calling on, and/or soliciting 3D Systems' customers for the express purpose of encouraging the termination of their relationships with 3D Systems and transfer of those relationships to direct competitor Union Tech.

89.     Miller's interference with 3D Systems' existing and prospective contractual relationships was without justification or excuse, but was instead committed in breach of Miller's contractual, statutory, and common law obligations to 3D Systems.

90.     Union Tech is vicariously liable for Miller's interference with 3D Systems' existing and prospective contractual relationships under the doctrine of *respondeat superior*

because, upon information and belief, Miller's overt acts in interference with such relationships were taken with express or apparent authority as an employee and agent of Union Tech and within the scope of such employment with Union Tech.

91. Alternatively, Union Tech is jointly liable for Miller's interference with 3D Systems' existing and prospective contractual relationships because, upon information and belief, Defendants combined in a civil conspiracy to accomplish the unlawful purpose underlying Miller's interference. Specifically, upon information and belief, Defendants conspired and agreed that Miller would wrongfully misappropriate 3D Systems' confidential, proprietary, and trade secret information during his employment with 3D Systems in order to enable Defendants' subsequent wrongful use of all such information to compete unfairly against 3D Systems during Miller's subsequent, higher-paying employment with Union Tech.

92. As a direct and proximate result of Miller's tortious interference with 3D Systems' existing and prospective contractual relationships, 3D Systems has suffered and will continue to suffer actual damages.

93. As a direct and proximate result of Miller's tortious interference with 3D Systems' existing and prospective contractual relationships, 3D Systems is entitled to recover its damages from Miller in an amount to be determined at trial that exceeds $75,000, exclusive of interest and costs.

94. 3D Systems is also entitled to an award of punitive damages due to the willful and intentional actions of Miller.

## FOR A SEVENTH CAUSE OF ACTION
### (Tortious Interference with Contractual Relations)
### (Against Union Tech)

95.     Each and every allegation contained in the preceding paragraphs 1-94 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

96.     3D Systems' Agreement with Miller is a valid and binding contract.

97.     Upon information and belief, Union Tech had actual or constructive knowledge of 3D Systems' Agreement with Miller.

98.     Upon information and belief, Union Tech intentionally, wrongfully, and maliciously interfered with 3D Systems' Agreement with Miller by knowingly and/or recklessly procuring, directing, authorizing, permitting, or condoning Miller's breach of the Agreement as set forth herein.

99.     Union Tech's interference with 3D Systems' Agreement with Miller was without justification or excuse, but was instead committed in an effort to compete unfairly against 3D Systems in the sale of 3D printers.

100.    As a direct and proximate result of Union Tech's tortious interference with 3D Systems' Agreement with Miller, 3D Systems has suffered and will continue to suffer actual damages.

101.    As a direct and proximate result of Union Tech's tortious interference with 3D Systems' Agreement with Miller, 3D Systems is entitled to recover its damages from Union Tech in an amount to be determined at trial that exceeds $75,000, exclusive of interest and costs.

102.    3D Systems is also entitled to an award of punitive damages due to the willful and intentional actions of Union Tech.

WHEREFORE, Plaintiff 3D Systems Corporation, having fully complained, prays for judgment against Defendants Paul A. Miller and Union Tech, Inc. with the following particular relief:

(1)    That the Court issue an Order granting 3D Systems' Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction;

(2)    That 3D Systems be awarded actual, compensatory, consequential, and special damages in an amount to be determined;

(3)    That 3D Systems be awarded punitive damages;

(4)    That 3D Systems be awarded attorneys' fees and costs associated with bringing and prosecuting this action;

(5)    That 3D Systems be awarded prejudgment interest; and

(6)    That 3D Systems be awarded such other and further relief as this Court deems just and proper.

*[signature page follows]*

Date: September 13, 2017

Respectfully submitted,

3D SYSTEMS CORPORATION

By its attorneys,

*s/ Rubin Pusha III*
John R. Maley, Esq. (14300-89)
Rubin Pusha III, Esq. (30815-49)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone: (317) 236-1313
Facsimile: (317) 231-7433
E-mail: jmaley@btlaw.com
E-mail: rubin.pusha@btlaw.com

*Pro hac vice application forthcoming*:
William H. Floyd, III
wfloyd@nexsenpruet.com
Nikole S. Mergo
nmergo@nexsenpruet.com
James A. Byars
jbyars@nexsenpruet.com
NEXSEN PRUET, LLC
1230 Main Street, Suite 700 (29201)
Post Office Drawer 2426
Columbia, South Carolina 29202
Telephone: (803) 771-8900
Facsimile: (803) 727-1429

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| 3D SYSTEMS CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION No.: _____ |
| | ) | |
| PAUL A. MILLER and | ) | |
| UNION TECH, INC. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFICATION

The undersigned, Andrew Johnson, being duly sworn, deposes and says that he is the Executive Vice President, Chief Legal Officer & Secretary for 3D Systems Corporation. The undersigned states that he has read the foregoing Verified Complaint, has personal knowledge of the contents thereof, and that said Verified Amended Complaint is true to the best of his knowledge, except as to matters stated therein to be alleged on information and belief, and as to those matters, he is informed and believes that they are true.

I, **Andrew Johnson**, hereby certify, under penalty of perjury, that the foregoing is true and correct. Executed this _12th_ day of September, 2017.

Signature: _____

Print name: _Andrew M. Johnson_

# EXHIBIT A

**THIS AGREEMENT IS SUBJECT TO ARBITRATION PURSUANT TO
SECTION 13.5 HEREIN**

**3D SYSTEMS CORPORATION
EMPLOYEE CONFIDENTIALITY AND
NON-SOLICITATION AND ARBITRATION AGREEMENT**

**NOTHING IN THIS AGREEMENT SHALL CREATE AN EXPRESS OR IMPLIED
CONTRACT OF EMPLOYMENT.  ALL EMPLOYEES ARE EMPLOYED ON AN AT-
WILL BASIS AND MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT NOTICE
AND WITH OR WITHOUT CAUSE. AS AN EMPLOYEE, YOU HAVE THE SAME RIGHT
TO TERMINATE YOUR EMPLOYMENT AT ANY TIME, WITH OR WITHOUT NOTICE
AND WITH OR WITHOUT CAUSE.**

THIS EMPLOYEE CONFIDENTIALITY, NON-SOLICITATION AND
ARBITRATION AGREEMENT ("Agreement") is made and entered into on
_JULY 10_, 20_13_, by and between 3D SYSTEMS CORPORATION, a
Delaware corporation (together with its subsidiaries, the "Company"), its successors and
assigns, and _PAUL MILLER_ an employee of the Company
("Employee").

<u>RECITALS:</u>

A.    During the course of Employee's employment with the Company, including
subsidiaries of the Company, Employee will obtain specialized and confidential
knowledge and information regarding numerous aspects of its business including
specialized and confidential knowledge and information relating to its products,
customers, business procedures and methods of operation.

B.    Employee desires to be employed by the Company and the Company
desires to retain the services of Employee.

C.    The parties hereto desire to set forth in writing their mutual understandings
and agreements regarding, among other things, the Company's trade secrets,
inventions, patents, customers, and property.

D.    In consideration of Employee's offer of new employment with Company, the
compensation paid to Employee, the confidential information made available to Employee
as that term is defined below, the training and certification(s) provided to Employee, and
the mutual covenants and agreements contained herein, the receipt and sufficiency of
which are hereby acknowledged, the parties hereto agree as follows:

## TERMS AND CONDITIONS:

1. <u>Purpose</u>. This Agreement does not in any way constitute, and should not be construed as, a contract of employment. Employee's employment at the Company is "at-will," which means that Employee may resign at any time for any reason and that the Company has the same right and may terminate the employment of Employee at any time for any reason.

2. <u>Trade Secrets and Confidential Business Information</u>. Employee recognizes and agrees that Employee will not, at any time, whether during or subsequent to the term of Employee's employment by the Company or any of its subsidiaries, unless done so in the performance of Employee's job responsibilities as an employee of the Company or specifically previously consented to in writing by the President of the Company, directly or indirectly use, divulge, disclose or communicate to any person, firm or corporation confidential information belonging to the Company or any of its subsidiaries or their business, as that term is defined in this Agreement. "Confidential Information" specifically includes: (a) the identities, buying habits or practices of the Company's customers; (b) the Company's advertising and marketing strategies, methods, research and related data; (c) the names of the Company's vendors, resellers or suppliers; (d) the cost, type and quantity of materials and/or supplies ordered by the Company; (e) the prices at which the Company obtains or has obtained or sells or has sold its products or services; (f) the Company's manufacturing, distribution and sales costs, methods and objectives; (g) technical information including machinery and equipment designs, drawings and specifications; (h) inventions; (i) pending patent applications; (j) product information including designs, drawings, specifications, methods of quality control and formulas or equations used in connection therewith; (k) "trade secrets" as such term is defined in S.C. Code Ann. § 39-8-10, *et seq.* or other similar applicable law of any other jurisdiction; and/or (l) customer lists, pricing lists, supplier lists or reseller lists. The parties hereto agree that the foregoing items of Confidential Information are important, material, and confidential, could constitute trade secret material, affect the successful conduct of the Company's business, and its goodwill, and that a breach of any term of this Section 2 is a material breach of this Agreement. Employee understands that nothing contained in this Agreement is intended to, nor will this Agreement be enforced in a manner so as to infringe upon or restrict any rights (if applicable) afforded to Employee under the National Labor Relations Act, including any rights related to protected concerted activity.

3. <u>Inventions and Patents</u>. Employee agrees, to the fullest extent permitted by applicable law, that all inventions developed by Employee, whether independently or with the assistance of others, during the term of Employee's employment with the Company or any of its subsidiaries, which are developed with the Company's or such subsidiary's equipment, supplies, facilities, trade secrets, or time, or which relate to the business of the Company or such subsidiaries or their respective

actual or demonstrably anticipated research or development, or which result from work performed by Employee for the Company or any of its subsidiaries, are the sole property of the Company or such subsidiary, as the case may be, and Employee hereby expressly assigns and agrees to assign all of Employee's right, title and/or interest in and to such inventions to the Company or a subsidiary designated by the Company and, upon request, will assist the Company and its subsidiaries in any manner whatsoever in obtaining patents for such inventions.

4. <u>Solicitation of Customers</u>. Employee agrees that, during the term of Employee's employment with the Company and its subsidiaries and for a period of twelve (12) months following separation of Employee's employment with Company, including termination by the Company for cause or without cause, Employee will not, directly or indirectly, either for Employee's own use or for the benefit of any other person, firm or corporation, divert or take away the business of, or attempt to divert or take away the business of, call on or solicit the business of, or attempt to call on or solicit the business of, or do business with, any of the Company's or its subsidiaries' customers, including, but not limited to, such customers as to whom Employee had called on, solicited, serviced or became acquainted with while in the employ of the Company or its subsidiaries.

5. <u>Solicitation of Employees</u>. Employee agrees that during the term of Employee's employment with the Company and for a period of twelve (12) months following separation of Employee's employment with Company, including termination by the Company for cause or without cause, Employee will not, directly or indirectly, either alone or in concert with others, solicit, induce, or entice any employee of or consultant to the Company or its subsidiaries to leave the Company or its subsidiaries for any reason whatsoever, or to work for anyone in competition with the Company or its subsidiaries, or hire any current employee or consultant of Company.

6. <u>Competition</u>. Employee agrees that, during the term of Employee's employment with the Company and its subsidiaries, Employee will not, directly or indirectly, either alone or in concert with others, compete with or make preparations to compete with the Company or its subsidiaries.

7. <u>Company Property</u>. Employee acknowledges and agrees not to remove Company property from the Company's or its subsidiaries' premises unless Employee's position specifically requires Employee to do so in connection with Employee's job duties. Upon request by the Company, Employee will immediately deliver to the Company all Company property in Employee's possession or under Employee's control in good condition, ordinary wear and tear excepted.

8. <u>Ownership of Customer Records</u>. Employee agrees that Company or subsidiary owned records of the accounts of customers, Company or subsidiary owned route books, and other Company or subsidiary owned records and books

specifically relating to customers, are the exclusive property of the Company. Upon request by the Company, Employee will immediately deliver such records, books, and records to the Company. In the event that Employee individually purchases such original books or records, Employee shall immediately notify the Company, who shall then reimburse Employee for such purchases, and the books or records will become Company property.

9. Employee's Duties Upon Separation. In the event that Employee separates from employment with the Company or its subsidiaries, for any reason, Employee agrees to deliver promptly to the Company in good condition, ordinary wear and tear excepted, Company property and customer-related records as set forth in Sections 7 and 8. The replacement cost for any Company Property which is not returned in accordance with the Company's Offset of Wages Agreement, as applicable, will be deducted from Employee's final payroll check.

10. Breach of Agreement.

10.1 The Company and Employee recognize and acknowledge that Employee is employed in a position where Employee will be rendering personal services of a special, unique, unusual, extraordinary and intellectual character requiring extraordinary ingenuity and effort by Employee. Employee agrees that a breach or threatened breach by Employee of this Agreement, including its covenants, could not reasonably or adequately be compensated in damages in an action at law and that Company shall be entitled to injunctive relief, which may include, but shall not be limited to, restraining Employee from performing any action that would breach this Agreement.

10.2 Nothing herein shall be construed as prohibiting the Company from pursuing any other remedy available at law or in equity to the Company as a result of such breach or threatened breach, including the recovery of damages from Employee.

10.3 The remedies conferred by the specific provisions of this Agreement, including this Section 10, are not exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise.

11.  Continuing Obligations.  Employee's obligations under this Agreement shall continue in effect beyond Employee's term of employment with the Company and each and every obligation of Employee under this Agreement shall survive any termination, or attempted termination, by Employee of this Agreement.

12.  Employee's Representations.  Employee hereby represents and warrants that Employee is free to enter into this Agreement and to perform each of the terms and covenants contained herein.  Employee further represents and warrants that Employee is not restricted or prohibited, contractually or otherwise, from entering into and performing this Agreement, and that Employee's execution and performance of this Agreement is not a violation or breach of any other agreement between Employee and any other person or entity.

13.  General Provisions.

13.1  Notices.  All notices or other written communications required, or permitted to be given by this Agreement shall be deemed given when personally delivered or two (2) days after it has been sent (the date of posting shall be considered as the first day and any Sundays, legal holidays or other days upon which the local mail generally is not delivered shall not be counted in determining this period) by registered or certified mail, postage prepaid, properly addressed to the party to receive the notice at the following address or at any other address given to the other party in the manner provided by this Section 13.1:

If to the Company:  3D Systems Corporation
333 Three D Systems Circle
Rock Hill, SC 29730
Attn:  Vice President, General Counsel
and Secretary

If to the Employee:  (Employee's address as specified on the signature page of this Agreement.)

Nothing contained herein shall justify or excuse failure to give oral notice for the purpose of informing the parties hereto when prompt notification is required, however, it shall be understood that such oral notice shall in no way satisfy the requirement of written notice.

13.2  Severability.  If any provision of this Agreement is determined to be invalid or unenforceable, the provision shall be deemed to be severable from the remainder of this Agreement and

shall not cause the invalidity or unenforceability of the remainder of this Agreement.

13.3  Successors and Assigns.  The parties acknowledge that this Agreement constitutes a personal contract with Employee. Employee may not transfer or assign this Agreement or any part thereof without the Company's prior written approval. This Agreement shall be binding upon and shall inure to the benefit of the Company and its successors and assigns, and shall be binding upon Employee and Employee's assignees, heirs, successors, executors, administrators and other legal representatives.

13.4  No Implied Waivers.  The failure of either party at any time to require performance by the other party of any provision hereof shall not affect in any way the right to require such performance at any later time nor shall the waiver by either party of a breach of any provision hereof be taken or held to be a waiver of such provision.

13.5  Arbitration.  All controversies, claims, disputes, and matters in question arising out of, or relating to, the Employee's employment with the Company or arising out of, or relating to this Agreement (or the breach thereof), shall be decided by arbitration in accordance with the provisions of this paragraph, with the sole exception of controversies, claims, disputes, and matters in question properly made or brought pursuant to the National Labor Relations Act.  Employee understands and acknowledges that nothing in this Agreement restricts Employee's right (if applicable) to file unfair labor practice charges or otherwise access the processes of the National Labor Relations Board.

The arbitration proceedings shall be conducted under the applicable rules of the American Arbitration Association ("AAA"). The arbitration board will consist of one arbitrator chosen by the Parties.  If the Parties cannot agree upon an arbitrator, they shall submit to the procedure utilized by AAA to choose an arbitrator.

The decision of the arbitrator, including determination of amount of any damages suffered, shall be conclusive, final, and binding on the Parties, their respective heirs, legal representatives, successors, and assigns.  The arbitrator shall be bound to follow South Carolina law and case precedent.  Any decision of the arbitrator will not be binding if the arbitrator fails to follow South Carolina law and case precedent.  The arbitrator shall render a

written arbitration decision that reveals the essential findings and conclusions upon which the award is based.

The Company shall bear the arbitration filing fees and the fees of the arbitrator for all actions filed by it. Each party shall bear his/her/its own attorneys' fees, witness fees and costs not unique to arbitration. However, if any party prevails on a claim which affords the prevailing party attorneys' fees, the arbitrator may award reasonable attorneys' fees to the prevailing party.

13.6    Governing Law.    This Agreement and all questions with respect to the construction of this Agreement and the rights and liabilities of the parties shall be governed by the laws of the State of South Carolina without regard to its laws relating to choice of law or conflict of laws.

13.7    Counterparts.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13.8    Section References.    Any reference in the Agreement to a section or subsection shall be deemed to include a reference to any subsidiary sections whenever the context requires.

13.9    Captions.    The captions of the sections and subsections of this Agreement are included for reference purposes only and are not intended to be a part of the Agreement or in any way to define, limit or describe the scope or intent of the particular provision to which they refer.

13.10   Entire Agreement; Amendment.    This Agreement contains the entire understanding between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written or oral negotiations and agreements between them regarding the subject matter hereof. This Agreement may be amended only in a writing signed by each of the parties.

13.11 <u>Prior Agreements</u>.  This Agreement replaces and supersedes any prior Employee Confidentiality and Non-solicitation Agreements between the Employee and Company.  Further, this Agreement replaces and supersedes any prior Agreement for At-Will Employment and Binding Arbitration between the Employee and Company.

13.12 <u>Notice to New Employers</u>.  The Company may notify anyone hereafter employing Employee of the existence and provisions of this Agreement.

13.13 <u>Effective Date</u>.  This Agreement will become effective on the commencement of Employee's employment with the Company.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above mentioned.

3D SYSTEMS CORPORATION

By _____
Andrew M.  Johnson
Vice President, General Counsel &
Secretary

_____
Signature of Employee

8805 W 700 N
Street Address

McCordsville, IN 46055
City, State and Zip Code

"Employee"

# EXHIBIT B


**3D SYSTEMS**

MANUFACTURING *THE* FUTURE

• MEMORANDUM

| **To:** Paul Miller | **From:** Human Resources |
|---|---|
| **Date:** 8/25/2017 | **Re:** Confidentiality Agreement |

This is to remind you that you signed a Confidentiality Agreement with 3D Systems.

Under the Agreement that you signed, you have agreed to a series of binding and very important commitments to 3D Systems. For example, in the first paragraph, you agree to keep confidential and not to use or disclose in any manner, any 3D Systems confidential information, as set forth in that paragraph. This would include, among other things, any analyses we have done of our competitors (such as those analyses which you have received during your tenure with 3D Systems).

In addition, you have agreed to return all Company property, and you have additional obligations, all of which are set forth in the Agreement. Each of these obligations is very serious, and it is important that you honor them.

At this point in time, there is no indication that you have not or intend not to honor your obligations. Thus, please treat this letter just as a reminder from the Company to you. Of course, if you have any questions whatsoever regarding the Agreement, or your obligations, please feel free to contact any member of the Human Resources team at 803-326-3933.